v. ExxonMobil May it please the Court. When this Clean Air Act citizen suit was tried nearly a decade ago, ExxonMobil urged the to enforce first principles of Article 3 standing and limit the plaintiff's claims to permit violations that had caused them injuries in fact. But the plaintiffs adamantly resisted, arguing that environmental citizen suits are not subject to the ordinary rules of Article 3 standing. In the decades since, as this case has wound its way through three appeals, ExxonMobil's position has been vindicated as a series of Supreme Court decisions, beginning with Spokio and culminating in TransUnion, have reiterated the longstanding principles of Article 3 standing and left no doubt that they apply fully to environmental citizen suits. Namely, only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. This judgment cannot be reconciled with that principle. The District Court here imposed an unprecedented $20 million civil penalty for more than 16,000 days of violation, on the basis of fact findings of injuries in fact traceable to just 40 days of violation, all of which had been abated long before trial. It did so because the plaintiffs told the Court they had no burden to prove standing with any greater precision. At the pretrial conference, they explained that they had no intention of attempting to prove injuries in fact that were traceable to each violation. And I quote, If we did want to prove that a particular event did cause a particular reaction in a particular person, that would take more proof. That was a confession of error. But that's not all. These plaintiffs didn't simply believe that they were exempt from the ordinary rules of Article III standing. They also believed that the Clean Air Act citizen suit provision gave them a special dispensation to second-guess the decisions of government regulators without any burden to show that they had been impacted in a personal and individual way. So as they told the District Court in opening statement, quote, Citizen suits were intended to be a mechanism for the public to second-guess the adequacy of an agency's response to Clean Air Act violations. In short, these plaintiffs believe that private citizens can step into the shoes of the government to re-litigate every permit violation over a period of eight years without the need to prove that those violations actually impacted them. As intervening Supreme Court decisions culminating in TransUnion have confirmed, all of that was wrong. Plaintiffs suing for statutory violations have the burden to prove the elements of Article III standing at trial, and they must do so for each violation. Standing is not dispensed in gross, but must be established for each claim and each form of relief. And when a case proceeds to trial, it must be established with sufficient evidence to the satisfaction of the fact-finder. Congress cannot create a statutory right of action that allows private citizens to sue for statutory violations that did not cause them an injury. And far from deputizing private citizens to second-guess government enforcement, TransUnion emphasizes that courts must be vigilant in enforcing the rules of Article III standing to respect the separation of powers. The plaintiff's strategy in this case rejected every one of those first principles. They advanced a more aggressive theory of citizen-suit litigation than any prior case of which we are aware. Rather than focusing on injuries in fact to their members, as in prior cases, the plaintiffs introduced into evidence the reports and records of thousands of permit violations at one of the largest industrial facilities in the United States, many of them so de minimis that they could not plausibly have affected anyone outside the boundaries of the facility, and requested the maximum penalty for each state of violation. For example, as we point out in the briefs, they sought penalties for a smoking extension court and for a, quote, fire in a cigarette butt can. They made no attempt to prove a causal connection between each permit violation and an injury in fact, and instead they told the court, quote, that's just flat out not the law of citizen-suit standing. There's a valid role for citizen-suits, but this case crosses the Article III line. To be clear, ExxonMobil does not deny that citizens have a right to sue for civil penalties in situations where they have suffered injuries in fact that are traceable to permit violations. We're not trying to change the rules of citizen-suit standing. Ever since this trial, we've simply been trying to enforce them. Congress cannot deputize private citizens to seek civil penalties for permit violations that did not injure the citizen-suit plaintiff, and we don't believe it has done so, but in any event, Article III would not permit it to do so. There's nothing radical or burdensome about the idea that citizen-suit plaintiffs are limited to seeking penalties for violations that harm them. They're simply required to prove a causal connection to a justiciable injury in fact. That burden is not unreasonable, and it's what Article III requires. The plaintiff's failure to carry that burden was a deliberate strategic choice, and they must live with it. To be explicit, plaintiff's problem in this case is one of their own making. We are not arguing that it would have been impossible for the plaintiffs to prove standing for more than 40 days of violation. We're simply arguing that they failed to do so for their own tactical reasons. As a result, they're limited to the 40 days of violations that the district court found satisfied both injury in fact and traceability. That brings me to the third prong of the Article III standing test, which is redressability. Once the standing inquiry is focused on the 40 days of violation for which the plaintiffs proved injury in fact and traceability, it is undisputed that all of those violations had been abated long before trial, and the district court did not find that penalties were necessary to deter recurrence. The plaintiffs do not contest that undisputed evidence, and they have never challenged that finding by the district court. As such, this case should be governed by the general rule of Steele Company and not the exception of lay law. Civil penalties cannot redress wholly passed violations. Finally, let me say a word about practical consequences. As we note in the reply brief, checks and balances are a feature of the Constitution, not above. And so there's no reason for the court to shrink from enforcing the rules of Article III standing. But to be clear, nothing prevented these plaintiffs from offering evidence to trace specific violations to concrete and particularized injuries in fact. They simply failed to do so as a matter of their own litigation strategy, and they must live with the consequences. On the other hand, consider the consequences of sustaining the plaintiff's theory. It truly would be a roadmap for runaway citizen suits. Regulated businesses are legally obligated to maintain reports and records of all permit violations. If a citizen suit plaintiff can offer testimony of just a handful of injuries correlated to just a few violations and recover penalties for every violation over an eight-year period, then Clean Air Act enforcement will have been turned over to private citizens in what Justice Scalia once called self-appointed mini-EPA action. TransUnion establishes that Article III forbids that result. And so to confirm that Fifth Circuit precedent conforms to the specific principles of Article III standing, we ask the court to reverse and render a judgment dismissing the civil penalty claim with an opinion grounded on these three fundamental principles. Number one, standing is not dispensed in gross. As the panel unanimously concluded, standing must be established for each violation for which the penalty is sought. And because the burden to establish standing increases at each stage of the case, standing must be proved at trial with sufficient evidence and to the satisfaction of the fact finder. To the extent that victim in the Texans United decision suggests otherwise, it should be clarified. Number two, citizen suit plaintiffs lack standing to recover penalties for permit violations in the absence of evidence and a finding that those violations caused them injuries in fact. To the extent Cedar Point suggests otherwise, it should either be clarified or overruled. And number three, wholly past violations, like the violations in this case, cannot be redressed by civil penalties. There's some discussion in the briefing about a forward-looking theory of standing for civil penalties. That theory is unsound. But to be clear, it is not this case. These plaintiffs requested civil penalties for thousands of past violations. The district court made findings of violations with respect to thousands of past violations. The court calculated penalties by considering the appropriate penalties for thousands of past violations. This is not a case about a forward-looking assessment of civil penalties. And the undisputed evidence conclusively proves that the only violations that caused these plaintiffs injuries in fact on this record had been abated, were not ongoing, and the district court did not find penalties were necessary to deter future violations. For that reason, the redressability requirement cannot be satisfied. We ask the court to reverse and render a judgment dismissing the civil penalty claim. Mr. Post, I want to talk to you about TransUnion. That was a damage suit where each plaintiff had to prove his damages and had to have standing. Don't you acknowledge that in citizen suits, as long as one citizen plaintiff has standing, that's sufficient? Your Honor, the existence of one citizen plaintiff having standing would be sufficient to maintain a suit, but the remedy would be limited to the standing established by that one plaintiff. And so, the court could not award a remedy that that one plaintiff had not actually experienced with an injury in fact traceable to a violation. Well, as long as you have standing, then you proceed with the suit and penalties are the merits of the case in a citizen suit. Your Honor, I think that's just irreconcilable with TransUnion. I think that's the proposition that TransUnion and Spokio settled in saying that Article 3 standing requires a concrete injury, even in the context of a statutory violation. Can I follow up on this? When I hear the word citizen suit, I often think of the False Claims Act and QTAM. Are you suggesting that TransUnion overrides QTAM law? No, it's an important distinction, Your Honor, because QTAM actions are distinct from citizen suits. And the Steele Company decision makes this point. I think it's a very important distinction because in a QTAM action, such as the False Claims Act, the relator is essentially assigned an interest in the government's injury. Why can't we think of this type of case as – you're saying it's distinguishable rather than analogous to the False Claims Act. Tell me more about that. Your Honor, I think the doctrinal reason is that Steele Company would foreclose analogizing this citizen suit provision to the False Claims Act. It specifically distinguishes the citizen suit provision of the Clean Water Act, which is identical from a QTAM relator's provision. And I would say, I think that one of the amicus briefs in this case makes an important point related to this distinction. The Center for Constitutional Accountability wants to save the statute from transunion by arguing that a citizen suit plaintiff can seek penalties when he or she suffers a separate and independent injury. We agree with that. That's our proposition. But the plaintiff has to prove that they have suffered a separate and independent injury. That's not the case in a QTAM action. So is your point that Congress could have written a Clean Air Act QTAM provision that plaintiffs could take advantage of, they just – just Congress didn't write one here? Presumably, Congress could write – That's a textual point, not an Article III point. I think presumably, Congress could write a QTAM action for purposes of Article III that would satisfy Article III. That might raise some other constitutional concerns. I think that would pose an Article II concern to the extent that Congress wanted to delegate the Clean Air Act enforcement wholly to private citizens, but it wouldn't be an Article III issue if Congress assigned a portion of essentially the government's standing to a relator. If in transunion, one of those plaintiffs would have had standing, then that suit could have proceeded, could it not? No, Your Honor. I think that's contrary to the holding of transunion. The whole point of transunion was the 1,800 class members who had suffered the injury, in fact, could proceed. No, but if the rule were the same on standing in the damage suit as it is in a citizen suit, then in transunion, if one of the plaintiffs had standing, then the case could have proceeded. Your Honor, the court allowed the case to proceed with the – It's not against the plaintiff's suit who didn't have damages. Well, that's correct. And weren't injured. I mean, transunion was an injury case. The holding of the case is, is it not, that these plaintiffs who didn't have damages had no injury? Your Honor, I think that's a fair characterization of transunion, and I think both the illustration of transunion and the legal proposition establishes that in a case like this one, these citizen suit plaintiffs can seek penalties only to the extent they proved an injury, in fact, traceable to a violation. We don't deny that they did that with respect to five admissions events that manifested themselves in 40 days of violation. That's simply all that they proved, and that's all that the district court found that they inferred. What's your best case for that, that in a citizen suit, the only injuries that can be established are the ones that the plaintiff establishes traceability from the injury to each violation? Your Honor, I think that that proposition is the proposition that transunion, Spokio, the Summers decision, the Raines decision, in an unbroken line established. Mr. Post? I'm pardon, pardon me, Your Honor, I apologize. You're not taking issue with Laid Law? No, I don't take issue with Laid Law. And why not? Well, Your Honor, I think that Laid Law is distinguishable from this circumstance. I think in Laid Law, the evidence of traceability was not even contested. That was the case that- Well, neither transunion nor Laid Law uses the word traceability, but what they do talk about is injury. And the injury in Laid Law was that the plaintiff refused to use that river for recreation, and because there were systemic ongoing discharges of mercury, the court emphasizes, in that river. Correct. So how would you analogize what was set up as the claim in Laid Law with what are the deficiencies, if you will, of the plaintiff's claims here? Your Honor, I think the key distinguishing factor about Laid Law is, the court said in Laid Law, the violation there was, quote, concededly ongoing. And the Supreme Court came back in Clapper to emphasize that that concededly ongoing nature of the violation was the key to the Laid Law decision. That was a case involving a single violation of a single discharge limit in a series of ongoing violations from a single discharge source. Mr. Post, why isn't that this case where there's a series of ongoing discharges from the plant and the plaintiffs are having, they're having ongoing harms and that they're having to move away or that sort of thing from Baytown? Well, Your Honor, because the violations here are simply dramatically more varied and diverse than the circumstances in Laid Law, and this is a proposition on which the panel agreed unanimously. I think it's important to recall that Judge Costa's majority opinion in the vacated panel opinion made the point that Laid Law was very different because that involved just one continuing discharge from one discharge source. Here you're talking about wildly varied violations. Look at count one of this complaint. Count one alleges a violation of a special condition that states that upset admissions are not authorized. There's no other common characteristic to all of the 10,000 violations of count one except that they were glossed as upset admissions. I have one more quick question. It has to do with Judge Ho's question. Are you distinguishing the Clean Water Act, are you saying that it marches in lockstep with the Clean Air Act in this? Your Honor, in every way that I know to be material to this case, I think that the two statutes are in lockstep. I'm not aware of that. Then what do we do with all the fact that the Clean Water Act has used this type of ongoing injury in numerous circuits throughout the country? When you do the circuit test, almost every circuit says Clean Water Act, this test applies. I think two very important principles to understand with respect to that question. Number one, I'm not aware that any of those cases has ever grappled with the proposition that standing cannot be dispensed in gross. The reason is those cases are characteristically associated with, as Judge Costa put it, discharge of one or two pollutants from one or two discharge sources. They don't have these kinds of wildly varied admissions or discharges. It's simply the case that none of those cases has ever grappled with the proposition that standing is not dispensed in gross. The plaintiff's theory here essentially argues that environmental citizen suit litigation is an exception to that proposition, and I just think that's unsustainable. So you think it's, if you've got a huge complex that emits thousands of violations and harms a number of people, it's harder to prove your standing in that case than it is where you've got a smaller polluter that only emits a few violations? Your Honor, I think it's not a matter of the character of the facility, but the nature of the plaintiff's claim. These plaintiffs took upon themselves this remarkable burden of showing injuries in fact traceable to this wide array of permit violations without any causal relationship whatsoever to injuries in fact traceable. Do you realize how hard it would be for somebody to keep a notebook by his side 24 hours a day and note when they saw a flyer or when they got the sweet smell? Your Honor, I actually want to disagree with that premise, and I think it's an important point to be made. We're not suggesting that this should be an onerous burden. The plaintiffs have access to ExxonMobil's reports and records. To the extent the plaintiffs could say they experienced an event that constitutes an injury in fact as recognized in the law and can relate it to one of those reports and records of violations, then causation can be established. And when they did that, the district court found traceability. But the point is, they did that only with respect to five events and 40 days of violation. The problem is not that the legal standard is burdensome, it's that these plaintiffs didn't want to meet it because for the vast majority of the alleged violations, they couldn't have even plausibly argued traceability. Can I test the... Okay. All right. You can ask one question. His time is up. Let me just... Okay. Let me just ask your commitment to that principle that you stated about the facts. In a hypothetical case, you can imagine scientists in a series of admissions saying the following two things. One, each individual admission could not have caused any harm. It's just one minor admission. The problem is it's the massive accumulation of 10,000 of these admissions. If you had a case where the science presented itself that way, where the plaintiffs dutifully presented that science, I assume you would agree that that would have solved the standing problem or do you think there's still no standing in that case? Ron, I would say that in most cases, with that kind of scientific proof, that would establish traceability. I want to add a caveat, which is that the climate change cases have drawn an outer boundary on that kind of theory. To say at some point, that inference of cause and fact becomes so remote and speculative that it's impermissible. But putting aside the extreme climate change scenario, I think if you have scientific evidence that establishes contribution to actual injuries in fact traceable to violations, then a plaintiff could carry their burden. These plaintiffs didn't put on that evidence. Okay, Mr. Post, you can go into that on rebuttal. Mr. Street? May it please the Court. In Lujan, the Supreme Court said, quote, the Constitution's central mechanism of separation of powers depends largely on common understanding of what activities are appropriate to legislatures, to executives, and to courts. We are asking this Court to use its common understanding of whether this type of lawsuit is appropriate to be adjudicated by courts or by regulators. The industry amici respectfully submit that the litigation of eight years of thousands of alleged permit violations encompassing numerous point sources and dozens of different pollutants is the task of the executive regulators and not the courts. Under Article III, the role of the citizen suit is to vindicate the rights of injured citizens, not to check the homework of the regulator over a long period of time. In other words, it's the TCEQ and the EPA's job to police facilities like the Exxon's Baytown facility on an ongoing basis, and they have plenty of tools to do so. The reason the industry has been watching this case closely for so many years and filed so many briefs is that this case is categorically different than any other citizen suit that we've seen. As the panel said in its second opinion, quote, citizen suits under the environmental laws typically allege injuries from discharges or emissions of one or two pollutants exceeding one or two emission standards all in the same manner, end quote. That was also the case in Laidlaw, to go to Judge Jones's question. It was one continuous discharge of mercury into one body of water. And that's why the other circuits have not grappled with anything like this case or had presented to them the traceability issues that they have presented now in this case. But if the court signs off on this sprawling action and declares there to be standing without evidence of traceable injury for each violation, then the floodgates will truly be opened. Indeed, the court should ask the plaintiffs and the government, under their theory, what is the limiting principle? It appears that the environmental plaintiffs in the future will simply need to identify a person who lives somewhere in the neighborhood of a facility or maybe somebody who just wants to visit the neighborhood and has been injured by one of the violations in the past. And under the government's theory and the plaintiff's theory, that will unlock the ability to relitigate every single permit violation from that facility stretching back nearly a decade and to recover penalties tied to each one. If that model is replicated throughout the states of the Fifth Circuit or around the country, the federal courts will be clogged with these enormous enterprises, and the citizen suit can no longer be called an interstitial remedy, as the Supreme Court has called it. Looking to bedrock principles of Article III standing, and I think going to Judge Davis' questions, there's no question that the plaintiffs established standing here. They got into federal court with respect to some claim. The question is the scope of the claims which they are allowed to litigate. And Spokio and TransUnion instruct that to determine when an injury or a claim exists, you look to common law analog. We can imagine a person who raises five claims of defamation based on a statement being repeated five times. The plaintiff very well may be able to prove defamation when that claim is repeated to his hometown newspaper and can prove that it injured him. He can establish standing traceable to that violation. But if the defamatory statement is repeated person to person, thousands of miles away from him, he may have trouble establishing standing as to that claim. That's all we have here. Turning to Judge Ho's question about the key TAM analogy, I think that Justice Scalia did address this in laid law in his dissent. But the key is, if the Clean Air Act were a key TAM-type statute, it would clearly violate Article 2 because, as Justice Scalia pointed out, the government cannot intervene and force dismissal of a Clean Air Act citizen suit. So it would lack all control of the type that it has in key TAM suits. So that's why a citizen suit plaintiff has to look to his own injury in order to satisfy Article 3. And I'll welcome the Court's question. Do you know how many citizen suits have been filed in the last three years? I don't have that data. But one of the amicus furnished some responses to information requests from the DOJ, and the answer was that an average of four suits were filed in the last three years, manually, annually. So where did your argument come from that this has raised a flood of litigation? I think the problem is that if this Court were to allow this type of citizen suit, that the nature and type of citizen suits is going to differ in the future. There's nothing that would stop a plaintiff from following this roadmap and finding the next large industrial facility, the next refinery, or whatever the case may be, finding the person who lives in that neighborhood, and litigating all the way back through the statute of limitations with respect to every permit violation there. You know, in late law, the Court went through the Article 3, Article 2 argument and found that due to the actions the plaintiffs had taken in getting approval for the suit and that the government had agreed to the suit, participated in the suit, there's just no Article 2 violation. What do you say to that? I mean, isn't that the law of the Supreme Court? Well, I don't think anyone here is affirmatively stating a freestanding Article 2 claim, that a citizen suit violates Article 2. I think the principal force of everyone's submission on my side is that to establish Article 3 standing, the plaintiff needs to establish a traceable injury as to each day of violation. If that's the case, then there's no Article 2 problem with the citizen suit. And I think the problem, going back to one of Judge Davis' earlier questions, is the way the nature of these cases will change. And I think the problem is, and it points up the Article 2 tensions, maybe not quite a constitutional violation, but the tension is, look at what the plaintiffs tried to litigate in this case. They alleged there were 16,000 violations over eight years. Up until the en banc court granted rehearing, the entire thrust of their case was asking the district court to determine that those were, in fact, violations of the Clean Air Act and that there were penalties associated with each one. The whole course of appeals up until this point had to do with how many violations were legally established at trial. And my point here is two, I guess. One is, the plaintiffs haven't litigated this as a forward-looking penalty theory. That was something brought up by the government in their brief. But number two is, the regulators looked at all of these violations over time. Isn't the forward-looking penalty theory in the plaintiff's original brief and in the complaint? They did seek an injunction. So to that extent, they sought forward-looking relief. The district court denied the injunction, and this court affirmed that denial in the first panel decision, which has not been revisited here. But as the case went forward at trial... But it's not forfeited or waived. I believe that it is, Your Honor, because of the way the plaintiffs tried the case, both on liability and on standing. As I just mentioned, the whole force of their liability theory was that they suffered these past violations and they were entitled to civil penalties, especially once the injunction fell out of the case. They also, if you look at their standing theory, while it is very limited, their standing theory is that these four individuals suffered some injury from five emissions events. It was not Exxon is repeatedly violating the law, and therefore we need an injunction to stop it in the future. The whole force and thrust of their argument was about how many violations had happened in the past. The plaintiffs did allege, didn't they, that they were seeking penalties awarded to the government to deter the defendant from further violations. Now, that's forward-looking, isn't it? I think that they may have alleged that in their complaint, but in a forward-looking case, I think we traditionally understand it with respect to injunctive relief, the idea is that you have some imminent risk of harm in the future and that you're trying to stop that. But what I'm communicating is that the thrust of this case was that there were 16,000 violations, according to the plaintiffs. When the case went to trial before Judge Hittner the first time, he found that there were only 94 violations. So the thrust of the case is whether there were these violations in the past, and therefore he assessed zero penalties. So you're disagreeing with the notion that at least in part the purpose of a penalty is to deter future violations. You disagree with that? No, I don't disagree with that as a theoretical matter at all, Your Honor. But my point is that when you look at the, for example, two things in the statute tell us that the penalties have to do with backwards-looking retribution and restitution, as ExxonMobil points out in its brief. For one thing, the penalties are capped per day of violation, violation in the past. When you look at the penalty factors in the statute, they have to do with backward-looking qualification. So, of course, at a theoretical level they do have some forward-looking deterrence effect, but that should not unlock the floodgates for a plaintiff to be able to seek adjudication of thousands of violations looking backwards and just say, well, we also allege we've also tacked on this forward-looking theory as an ancillary theory to our case, and therefore we can now litigate a case over the course of eight years. Okay. Thank you, sir. Court will hear next from Mr. Nicholas for plaintiffs. May it please the Court? I'd like to make three points. First is that Exxon's standing argument is fundamentally flawed because it misconstrues the plaintiff's claims and the nature of the citizen's suit penalty. Second is that Exxon's view of traceability is untethered from the actual injury in this case. And the third is that there is no Supreme Court case requiring a change in this Court's long precedent on citizen's suit standing. And after that, I'd like to address two or three points that were made from the questioning. On the first point, Exxon treats each day of violation as a separate claim, as if plaintiffs brought 16,386 claims and had to prove standing for each one of those. That's not what a clean air act citizen's suit is. A clean air act citizen's suit is essentially defendant, you are violating a permit limit, court, please stop defendant's violations. The relief is purely perspective. So a clean air act claim is asserted permit limit by permit limit, not violation by violation. And the plaintiffs in this case proved standing permit limit by permit limit, claim by claim. So there is no standing in gross. A penalty does not compensate a plaintiff for suffering through a violation. Its function is to deter future violations. The maximum penalty is determined by the number of days of violation, and that's to reflect that the more serious or recidivist a violator, the more deterrence may be warranted, so a bigger maximum penalty must be faced. On the second point, Exxon has argued that plaintiffs have to trace their injuries to specific violations. But the injury in this case is the risk of imminent future harm. Plaintiffs have to prove that at the time the complaint is filed, the risk of imminent future harm, the risk that the various aesthetic and physical injuries suffered by plaintiffs will occur in the imminent future and can be traced to Exxon's future permit violations. This can be done with a variety of evidence. It can be done with expert testimony. It can be done with testimony from standing witnesses who have suffered injuries in the past. It can be shown with the evidence on how the chemicals that are being illegally emitted will cause the very injuries suffered by plaintiffs and the like. And this was done for each of the approximately 60 limits at issue in this case. On the third point, this Court has been consistent with its approach to citizen-assisted standing for decades, from Cedar Point through Center for Biological Diversity versus EPA, which in turn is consistent with Laid Law. There's no recent Supreme Court authority that warrants a different result, and so this Court should adhere to its long-term precedent. While Exxon emphasizes transunion, transunion does nothing to overrule Laid Law or Cedar Point and its progeny. To address a few points that were brought up earlier, this case is not different from other citizens' suits by virtue of the fact that there were many permit limits being violated and there were a number of emission points at issue. Basically, our case was Laid Law 60 times over. The plaintiffs proved standing for each of the 60 violations. It may be considered to be a bigger and more significant case than Laid Law for some reasons, but the plaintiffs adhered to Laid Law and proved standing in the manner that the Supreme Court approved of. Another point I'd like to address is that there was a suggestion that the violations were wholly in the past. That's not true. The 60 permit limits were being violated after the complaint was filed. And thirdly, the industry amici suggest that plaintiffs did not litigate this case as one that involves future injury or forward-looking relief, but I would just point to the Court's attention. In the complaint in paragraphs 7, 47, and 85, we allege the future-looking injury and the forward-looking nature of the remedy. At trial, members testified that they don't want to breathe the pollution into the future or suffer the injuries that they've been suffering in the past. That's a record on Appeal 16120, 14-20, and 16174, 4-9, as an example. Members testified about their current injuries. At trial, Shea Cotter was on the stand being cross-examined, and as it turns out, I believe the Court, or perhaps from Exxon's own cross-examination, the question came to him, when was the last time you were injured by an Exxon emission? And he took out his cell phone, and he said, well, I can't remember the exact date, but it's on my phone. Can I show it to your court? And he showed it to the court, and he showed it to the judge, and looked at it, and this had happened only a few weeks before trial. And Marilyn Kingman at trial had also testified about violations that she had suffered through and had an injury from that occurred actually during the course of the trial. We put on engineering testimony about fixing the problems. There are the four projects that are mentioned in the briefing. And finally, the findings of fact and conclusions of law at record on Appeal 10918-19 lay out this very theory about penalties deterring future violations. And I weigh the balance of my uninterrupted time. So in your brief, I believe you take the hypothetical in transunion. People say transunion has nothing to do with this case. Well, Justice Kavanaugh did write about the factory in Maine and the person living in Maine and the person living in Hawaii. And that came up in this case in regard to Judge Oldham's observation that if Mr. Cotter had gone on a European vacation, he wouldn't have been exposed to the supposedly harmful emissions. But in your brief, you said that's wrong. He can get his forward-looking remedy even if he did go on vacation. So how do you square your position with transunion? Well, transunion was a case about injury. Well, so was Laidlaw. The word tracing does not appear in Laidlaw. And I certainly agree Laidlaw has to be a compelling model for what constitutes traceable injury. But transunion is very plain that people's rights were violated, but they couldn't sue because they couldn't prove that the violation had matured into traceable injury. In transunion, there was no— the plaintiffs did not prove that there was an imminent future harm, that there was a realistic possibility of future harm, which is much— Well, what do you do with the fact that on remand, after the second decision in this case, when there was supposed to be a geographic nexus case, which I gather nobody's defending anymore, but when that was proven or when that test was articulated, the plaintiffs conceded that no emission less than one pound was actionable. Yes, and we did that, Your Honor. And there were thousands of those, were there not? Yes, and we did that because that—basically, that was—we played the hand we were dealt by the second—by ETCL II. And as a decision, perhaps— So Mr. Cotter has standing to assert a $37,500 penalty because of the cigarette butt that accidentally ignited when it was thrown in the trash can and they poured water on it. Right. He has standing—that's your claim, is that correct? Well, no, Your Honor. Of course it is, because you want recovery for $16,000, every single violation, every single upset reportable or recordable, and the recordable ones, a whole lot of them are less than a pound. Your Honor, the plaintiffs do not recover the penalty. The penalty is assessed against Exxon to deter it from future violations. So what happens is the court considered all of the violations, all 16,386 days of them. So let's take the smoldering board example that Exxon uses in its— The smoldering board example is there was a smoldering board. It violated the law, it violated the permit because there were an excessive amount of volatile organic compounds that was emitted as a result of the smoldering board, a small amount, very short period of time. That was one of approximately 3,000 violations of volatile organic compounds. So in considering how to deter Exxon from violating the volatile organic compound permit limit in the future, the judge considered that violation along with the other 2,999 violations and determined this one isn't that serious. But that's not laid law. That is a far piece from laid law. It's a far piece from Gwaltney. It's a far piece from Cedar Point, TransUnion, every other case except perhaps Utah Physicians. It is not a far—it is not far from laid law because in laid law there were 489 violations. That was approximately, yeah, over 7 years and that amounted to approximately 70 per year, including mercury. So that means more than one every week, plus observable whatever else was causing the odor in the river. Can I follow up on Judge Jones's question, maybe ask it in a little bit different way? So you mentioned the smoldering board example and that violates a permit. You said the name of the permit, but I don't remember. What was it again? Volatile organic compound. Now you said that there were about 3,000 of those violations. Is it your view that that represents an ongoing violation of the permit? Those 3,000? Yes. Okay. Before and after. Right, but the problem I have is that we used the smoldering board example. I'm assuming we went through all 3,000 of them and said this is what violated the permit. We're talking about discrete instances. You know, a smoldering board here, a cigarette butt there, some other thing that's more serious over here. How can you credibly, coherently speak of that as an ongoing violation? Because in laid law, what we have was ongoing emissions of mercury that violated a single permit. And here we're talking about discrete events. So I don't understand the use of the word ongoing. As this court held in Carr v. Altaverde, an ongoing violation is simply one. Look at the permit limit. If the permit limit is being violated before the suit is filed and after the suit is filed, it is ongoing. It's the permit limit that is the focus of an ongoing violation. So volatile organic compounds, if they were violated, you know, 1,500 times before the complaint was filed, they were violated, you know, 1,500 times after the complaint was violated. And that's the way the permits are written. That's the way the TCEQ regulates. Can you clarify something on the facts that I've never quite understood? The statute authorizes a citizen suit for ongoing violations, not of a permit, but a standard or limitation. Am I correct that a permit may have a bunch of different standards in it for different kinds of pollutants? Yes.  Are you not putting Judge Duncan's question slightly differently? I'm not sure what the standard is that governs the cigarette butt, whether that's the smoke or the flares. But if that is one standard for smoke, and that's a discrete standard, then another permit in a whole different part of the plant may have something about smoke. But it's a completely discrete event. So how do you gin up standing from those discrete substance-by-substance exceedances? The plaintiffs alleged violations and proved violations of 60 different permit limits. Some were plant-wide limits called flexible permit limits. So there's one limit that applied to the entire plant. It didn't matter what emission point the volatile organic compounds came out of. Exxon has one limit covering the entire plant. That's the way they want it. That's the way they want it to be regulated. So if the VOCs are being excessively emitted in one part of the plant or another part of the plant, it doesn't matter. That's still the same permit violation. But you say there are 60 different permits. And the way the court in the second appeal divided this up was 24 pollutants. Yes. Do you take issue with that? No, Your Honor, because the 60 permit violations dealt with basically 24 pollutants. I mean, each permit dealt with a particular chemical, as I understand it. So it had a limitation of emissions for each chemical, and the district court went through all of the chemicals that Exxon reported violations on. Did it not? Yes, that's correct, Your Honor. No, but the permit is a job thing, and the law says each standard. So for each individual volatile organic compound, you have a standard because they vary. Benzene is 100 pounds, something else is 10 pounds, and I derive that from the revised findings of fact in the tables of the district court. Do you take issue with the way the district court divided up the 24 pollutants? No, Your Honor. Okay. The 24 pollutants. Well, what I'm suggesting is that there may have been permits that covered the whole facility, but among these 60 permits, some of them had a small, let's say, hydrogen sulfide, and I'm totally talking off the top of my head. Some of them may have had a zero emission for H2S, but another one may have had one pound for H2S. But you're saying if they violated this standard, a violation of this separate standard is a violation of every H2S standard? Well, I guess the way to think of it, I guess I can put it this way. I mean, maybe I'm totally balled up on the facts, but that's the way. Let me ask you this. When they say standard, aren't they talking about a standard for the amount of pollutant that can be emitted? If you violate a limit or a standard, then it's in violation. Correct. Correct, Your Honor. And the idea is that the plaintiffs are suffering from an excessive amount of emissions from Exxon. They know that they're being affected by the emissions because they live next to the plant, and they're coughing and have respiratory problems, and they smell all of the bad odors from the plant. So they want all of that to happen as little as possible. So going forward, the less hydrogen sulfide that they have to smell that smells like rotten eggs, the less hydrogen sulfide that they smell, that will at least to some degree redress their injury going forward. It will help reduce the risk that they will smell rotten eggs in the future or that they will see smoke in the future, and that's the Article 3 now. Let me bring you back to the Hawaiian vacation incident. Under the Clean Air Act, if one of the plaintiffs takes a vacation to Hawaii or stays away a month or whatever, if you've got other plaintiffs who are present, the association still has standing, doesn't it? That is correct, Your Honor. But as we pointed out in our papers on the Bob hypothetical and the descents of ETC02 and ETC03, the plaintiffs live in Baytown. They live right next to the plant. Actually, only two of them live anywhere in the vicinity. Actually, only one of them, I think, Mr. Cotter, who's now two miles away. The others visited. One of them moved away. Let's be, you know. Well, at the time that we filed the complaint, one of the Mrs. We're talking after trial, so we're relying on the proofs and the district court's findings. All right. Fair enough. I will say that standing is measured at the time that the complaint is filed. Oh, excuse me. Even taking later terms of event into account. Would you explain how in a citizen suit standing and penalties are divided? Well, the penalty is, I guess, for Article III purposes, the inquiry is whether a penalty will provide the justice. Counsel, there were some questions earlier of your opponent regarding the QTAM statute. I noticed you haven't picked up that banner as part of your argument here today. Do you find any support for your standing argument under the QTAM statute by analogy? Well, as I understand it, the basis for a constitution, well, I believe that QTAM is analyzed as an assignment of a claim. And I do not, and the plaintiffs do not consider a citizen suit to be an assignment of a claim. The plaintiffs are asserting their own claim. Yes, and in regard to that, why aren't you directly interfering with the efforts of the local authorities? And I understand they filed amicus briefs and they say we're totally on board with this. But your claim for penalties was originally over $40 million. Exxon, I forget whether it was at the time of his case or shortly afterward, had entered into a considerable settlement agreement with state authorities to upgrade the plant in various ways on a certain timetable. What are you doing that does not interfere with the state's regulatory actions? A few responses to that. First of all, the Clean Air Act is set up so that just as a matter of statute, that a local authority, state authority, can only preclude a suit or interfere with a suit if it files first. 60-day notice period, if the state doesn't file, then the plaintiffs can file a suit. Secondly, as the district court found in this case, when Exxon raised this very kind of issue, well, the district court actually said that citizen suits are intended to second-guess government and noted specifically that there's a regulatory capture problem with agencies. And, in fact, that was brought up in this case because – Well, in fact, the state or whichever regulatory – could have decided that minimal things like cigarette butts and less than one pound and violations that existed for 10 minutes because a seal came loose at some point or flares that did not result in flaming and so on were not worth pursuing because, in fact, nobody was at risk of being injured. They could decide – they absolutely could decide that enforcement is not necessary. And that's the only way a citizen suit could happen in the first place. So that's basically every citizen suit. Can I just ask one quick question? Assuming, arguendo, that the court were to say that we have – that there is a violation-by-violation approach, which I know you argue against, would we need to remand so that you could see if you could challenge 3,000-plus days? Or what happens in this case if you were to lose and the other approach would be adopted? Then we're back to – then the court would be back to the ECCL2 situation and the court's finding on its second remand, I guess its third decision. And so the result would be approximately $14 million pounds. On the state violations, the district court didn't count the violations of state assessed against Exxon in this award. Didn't he take those out of any – he reduced the number of violations? Yes. Yeah. Is that a render for $14 million, or are you saying remand so that you can try to establish your $14 million? No, it would be to affirm the $14 million penalty, which would be the third district court opinion. So we would urge that if a – Can I just follow up on my earlier question about the evidence? If I understand correctly, your theory of this sort of categorical – I think of it as a categorical presumption of traceability, it's based on a legal theory, right? It's not based on a scientific evidentiary theory, or am I mistaken? I don't quite follow you. I don't quite follow your question, but traceability – As I understand it, you're rejecting the notion that traceability has to be proven on each violation. You're just – you think that you can wave a magic wand and say you've got standing as to all the violations. And I guess what I'm wondering is, is that argument solely based on legal statutory theories, or is there any evidence in the record to support that as a scientific matter? Well, I guess it's both. As a legal matter, since the injury is the risk of imminent future harm, then you don't need to go back to all – look at every violation to determine what the risk of imminent future harm is, and the court does not need to go back and do a standing analysis for all 16,000 claims to determine what penalty to assess to deter future conduct. Now, in this case, we proved, the plaintiffs proved, that the plaintiffs' members suffered a variety of different harms. It was discussed in detail at trial. The plaintiffs proved that all of the chemicals that were illegally emitted cause or contribute to those very kinds of harms. There was eyewitness testimony. Well, your time's up, if you want to say something quick. That's all right. Thank you, Your Honor. All right, thank you. We'll hear next from Mr. Anderson. And you have waived your uninterrupted time. Good morning, Your Honor. I'd like to emphasize two points on the standing analysis and then respond to the separation of powers argument. My first point on standing is that the Supreme Court has repeatedly held that in the context of citizen suits, the purpose of civil penalties is to deter the defendant from continuing to violate its permit, and in laid law, the court explicitly described penalties as an alternative to an injunction for securing future compliance. Civil penalties are therefore prospective remedies, and the well-established standing analysis for prospective relief applies. It is the same analysis that applies to an injunction. That has been the settled law for more than two decades, and none of the recent cases that Exxon cites calls it into question. By contrast, Exxon's theory is completely novel. Exxon acknowledges that the injuries, any past injuries the plaintiff suffered cannot be . . . Counsel, I just don't understand that. Is there a different Article III standing analysis for a citizen suit? No, there is not. Okay, so what do you have to show your injury is traceable to in order to be a citizen plaintiff? So to . . . Is it not a violation? You need to trace your ongoing . . . And yet penalties may be assessed for each day of violation according to the statute. So I'm assessing a penalty for each day of violation. I'm a citizen plaintiff. Do I not have to show that my injury is traceable to that violation? No, Your Honor, and two points . . . So what does my injury have to be traced to then? Your injury has to be traced to the ongoing conduct. Citizen plaintiffs must show that the defendant . . . Okay, the smoldering board example. I want to sue because the smoldering board violated an emission standard in a permit. I'm a citizen. I want to sue for that. Do I not have to show that my injury caused from the emission is traceable to the violation that is represented by the smoldering board? The citizen plaintiff cannot sue just for a smoldering board violation. The citizen plaintiff must establish that there is an ongoing violation which requires a course of conduct. Three smoldering board violations. Three smoldering board violations over a course of time. You still have to establish standing . . . Is that not . . . so I can't sue for the three smoldering board violations? You can . . . if they establish an ongoing violation, you can sue. What is an ongoing violation? Ongoing violation, the Supreme Court has said in Gwaltney, occurs when a defendant violates this permit and continues until such time as the defendant takes actions that make recurrence of the violation unlikely. So five smoldering board violations, I want to sue for that. They harmed me, right? Can I do that? You have to establish that that ongoing violation . . . Okay. Do I not have to show my injury respiratory problem is not traceable to the ongoing smoldering board violation? You would have to show that it is traceable to the ongoing violation, but not necessarily to any particular past violation. Okay. That is the analysis that the Supreme Court announced in City of Los Angeles v. Lyons that it applied in Laidlaw . . . That's a chokehold case. Come on. That's not . . . That's a chokehold case, but it's the same point. The court said just because Mr. Lyons had experienced a chokehold in the past did not get him standing to sue in the future because he couldn't show that he was reasonably likely to be harmed in the future, and that's the same standard that citizen plaintiffs have to make in a Clean Air Act case. But, I would like to talk about how unusual Exxon's theory of the case is. They acknowledge that past violations can't be redressed in a citizen suit, and yet they still would have the court require, as a matter of Article III standing, that the plaintiffs prove that they were harmed, that they suffered unredressable injuries to establish the existence of the case. Well, how does that differ from TransUnion? So, TransUnion was a case about retrospective damages, Your Honor, and in that case the Supreme Court explicitly distinguished . . . Well, Laidlaw . . . Laidlaw . . . You know, the penalty in Laidlaw is $479,000, which doesn't look like very much money, even though it was mercury that was being emitted for seven years. The statute ties penalties to everything in the past, right? So, Your Honor, I think it's important to distinguish . . . Does it or does it not? It says, you know, the violations, the . . . I don't have . . . The statute says that the district court shall apply any appropriate penalties. No, no, no. The criteria, you know, expressionis exclusio alterius. The statute says these are the factors pertinent to penalties, and every one of them is, quote, passed. Some of them . . . and I would say, Your Honor, that there's nothing unreasonable about directing a court to look at a defendant's past behavior when determining what penalty is appropriate to deter future wrongdoing. Congress . . . I'm sorry, counsel. If Congress amended the FCRA, the Fair Credit Reporting Act, and said the damages authorized by the statute are to deter future violations of the law, does TransUnion come out differently? I think it very well may, Your Honor. So the entire analysis was the fact that it was damages, retrospective damages, as opposed to prospective damages? Yes, and that's what the Supreme Court said when it explicitly said that the analysis would be different if they were talking about prospective injunctive relief. I'm . . . different question. I'm not . . . so you bring up Lyons, obviously an injunctive case. Obviously, if the question is about prospective injunctive relief, we understand that. I'm talking about purely monetary, so the only distinction, the only amendment to the statute says you still get paid, all of the class members still get paid, all of the facts are identical. The only change is that the FCRA says one sentence, these damages are for . . . to deter future violations of the Fair Credit Reporting Act. So I think that there could be standing, but I think then the penalty analysis might have to be different if the plaintiffs are recovering the damages themselves, which is not this case where the damages get paid into the Treasury. But as far as the legal degree goes, I think that that would probably be correct. Great, so let's change it that way. Suppose that instead of the plaintiffs getting the fees in transunion, suppose that the fees went into the Treasury as a way to deter credit reporting agencies from violating the FCRA. So then . . . That would be this case. And so that would be . . . there would be standing in that circumstance. There would be standing, yes. If they could show that there was an ongoing violation of their rights under the statute. Mr. Anderson, if we were to say it must be a violation by violation, backward-looking, traceable to each violation approach . . . I'm not foreshadowing, I'm asking a hypothetical. Would we be in good company amongst the fellow circuits, or would we be an outlier? You would be an outlier, Your Honor. No court of appeals has ever held that that we're aware of. Instead, the courts have applied Friends of the Earth in the way that we suggest, which is to look at the risk of future harm and whether that risk of future harm is traceable. Which ones would you point us to? I would point you, in particular, to the Fourth Circuit's en banc opinion in Gaston Copper, which went in some depth into all three elements of standing and how it applies. That was a Clean Water Act case, but we do agree with Exxon that Clean Water Act cases are fully authoritative in this context. Isn't it significant in the facts of this case that the district court denied forward-looking relief in the form of an injunction to begin with? Plaintiffs have never even raised that, so he must have denied the concept of forward-looking injury. I don't think that's necessarily true, Your Honor. And the Supreme Court has emphasized the importance of remedial discretion in Weinberger v. Romero-Barcello and in Friends of the Earth and said that an injunction, though a powerful remedy, is a burdensome remedy for the district court. And there may be cases where a district court feels that it's more appropriate to apply penalties to deter future harm. But I don't understand how that bears on standing. I don't think it does bear on standing, Your Honor. So penalties don't bear on standing. So I think it's important to distinguish between the merits of the plaintiff's case and standing. Standing only asks, is this plaintiff harmed by this defendant's conduct, and can that injury be redressed through judicial relief? The amount of relief is a statutory merit question. I'm not talking about the amount. I'm just saying the accessibility of the penalty that you're looking toward is based on violations. So standing ought to be tied to violations, shouldn't it? No, Your Honor, because, again, we think that that's a merits question. That's the quantum of relief that's available. It's not the specific quantum in this case. It's the maximum that's available, and that's a merits question. What case says that? Good question, Your Honor. I don't think there is a case that says that, although the Supreme Court has cautioned that courts should distinguish between the merits and the standing analysis and keep them separate. That was part of Justice Scalia's opinion in Steel Company, and Chief Justice Roberts recently said something similar in FEC v. Cruz. But they still had to prove something. Chief Justice Roberts said you presume that the plaintiff will prevail in their case in the merits when you do the standing analysis. So you're basically ignoring—I mean, these plaintiffs, as I understand it, sought to prove that I had asthma. That's the best case. I saw flares. So you're saying the fellow said, I saw flares five times because the district court accepted that. But every single time there was an unpermitted flare, that's an ongoing violation. Even if the tree fell in the forest and nobody could see it. So that is— Yes or no? It's an element that the district court can take into account in assessing the appropriate penalty. And it's also— Yes or no? I can't answer that question. Okay. Thank you. Thank you. All right. Mr. Post, rebuttal. Thank you, Your Honor. I want to address three topics in rebuttal. The relationship between Article III and the statute, the nature of what the plaintiffs, in fact, proved, and this issue about a forward-looking theory of standing. First, the principal argument that the plaintiffs make is that ExxonMobil misunderstands the nature of a Clean Air Act citizen suit and that the way the statute constructs the claim has some significance to Article III standing. That is precisely backwards. This is exactly the proposition that Spokio and TransUnion reject when they hold that Article III standing requires a concrete injury, even in the context of a statutory violation. So Congress cannot daisy-chain together a series of violations, some of which didn't actually impact an individual plaintiff, and afford them standing to sue. The plaintiffs are trying to make the statute control Article III rather than vice versa, and that's simply wrong. And that's why, for Article III purposes, standing must be determined on a violation-by-violation basis. Judge Elrod? I'm thinking an injunction. You wouldn't have to prove that, though, would you? Your Honor, with respect to injunctive relief, the analysis would be different, and that underscores the distinction between an injunction and civil penalties. Laidlaw said penalties is an alternative to an injunction. It gives the plaintiff the right to get redress that way because it deters the defendant from continuing to violate. Absolutely correct, Your Honor. Laidlaw holds that there is an analogy between injunctions and civil penalties. With respect to deterrence, that applies to redressability. It does not follow, and no court has ever suggested that that means traceability analysis in a claim seeking civil penalties is somehow forward-looking. That's incoherent. The penalty analysis is inherently looking backward to the violation that caused the injury. But Laidlaw landed relief and found standing. Yes, Your Honor, with respect to the injuries, in fact, that were proved there, but Laidlaw did not address this question of traceability. And I think that this point is important because it goes to the government's idea that somehow this is a forward-looking analysis. Now, Judge Elrod, I want to speak directly to the question you posed about whether this issue was really waived. Put aside what the plaintiffs put in their pleadings. Lewis established that at the end of the case after trial, the remedy has to be limited to what the plaintiffs proved at trial. And what the plaintiffs proved at trial was a case about past violations. And I point you to page 18938-39 in their closing argument where they said this. They're requesting penalties for, quote, over 10,000 days of violation dating back to October 2005. This was not a forward-looking penalty case. They're reengineering it now to try and solve their traceability problem. But that's not the case that they tried. And I would also say it is sufficient to decide this case to say that this was not a forward-looking case. But it's not necessary to do that. I think you would do a service to the law by rejecting this forward-looking idea that the government is putting forward. No court has adopted this proposition. I am not aware of any court that has held that somehow traceability analysis for purposes of civil penalties could be forward-looking. And it's based on a false equivalence between injunctive relief and civil penalties. Injunctions are inherently forward-looking with respect to traceability. That is not true for civil penalties. The Supreme Court has not suggested that. When the government made a similar kind of argument relying on Spokio in TransUnion, the Supreme Court rejected that and said that's based on our holding in Clapper, and that relates to injunctive relief. Well, the relief is that SALT is forward-looking. That is to deter the defendant from further violations. No, Your Honor. And this is an important mistake that the government and the plaintiffs are making. Civil penalties are not purely prospective. Yes, they have a deterrent function, but they also have a restitutionary function and they have a retribution function. The Supreme Court established that in the Tull decision when it held that civil penalties accomplish all three of those purposes. Restitution and retribution are at issue in one of these penalty cases because the regulated entity must make restitution to the government for a violation of a permit issued by the government, and there is retribution for the violation. And that is what the district court was analyzing here. And I would quote on this point the government's own statement to the First Circuit en banc just last year in the Blackstone-Headwaters case that we cited in our brief. They said in that case, quote, a civil penalty is a distinct form of relief from a declaration or an injunction. Let me ask you this, Mr. Spokio. We had some injuries here when people were concerned about their future health, inhaling benzene, which is a known carcinogen, and other harmful toxic chemicals, concerned because of these ongoing violations and the really continuous exposure to these chemicals they were faced with, concern about getting cancer and other injuries in the future. How would you connect up the injury to the violation in that case? Your Honor, this is an important point because plaintiff's argument around that evidence outruns the district court's findings. They're reciting to you their version of the evidence, but that's not what Judge Hittner found. He did not find traceability based on any such fear about future violations. And I would point out at pages 13291 to 292, footnote 256, Judge Hittner specifically found that the plaintiff failed to prove even the potential of any adverse harm to public health or the environment. The argument that you've heard about violations of 60 limits having been established for standing purposes outruns the district court's findings. So if you were to prevail on your violation-by-violation approach, do we render for $14 million? Is that correct? That's what the opposing counsel said. No, you would not, Your Honor. You would render, I would submit, for zero based on the redressability problem, or at the very most you would remand for consideration of those 40 days of violation. And I think that it's important to recognize What if they say they can prove $3,000-something? Your Honor, they didn't prove that. This trial was 10 years ago. These plaintiffs tried their case. They made their decisions about the record they wanted to make and the strategy they wanted to pursue. Judge Hittner made very precise, detailed findings. If you look at his findings on the third remand, you will notice he rejected inferences the plaintiffs asked him to draw repeatedly where he was given the latitude to draw inferences. Judge Hittner has made these findings. The only violations that are traceable to injuries, in fact, are those 40 days of violation, and this judgment should be limited accordingly. All right, so thank you. Thank you, Your Honor. This case, as I mentioned, the court will have a brief recess, and some of us may not choose to leave the bench, but counsel are dismissed.